In re Oliver L. NORTH (Regan
Fee Application).

Division No. 86–6.

United States Court of Appeals,
District of Columbia Circuit.

Dec. 22, 1995.

**892**

## ORDER

**PER CURIAM.**

This matter coming to be heard and being heard before the Special Division of the Court upon the application of Donald T. Regan for reimbursement of attorneys' fees and costs pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. § 591 *et seq.* (1988 and Supp. V 1993), and it appearing to the court for the reasons set forth more fully in the opinion filed contemporaneously herewith, that the motion is in part well taken, it is hereby

**ORDERED, ADJUDGED,** and **DECREED** that the United States reimburse Donald T. Regan for attorneys' fees and expenses he incurred during the investigation by Independent Counsel Lawrence E. Walsh in the amount of $41,883.79, this 22nd day of December, 1995.

**PER CURIAM:**

Donald T. Regan petitions this court under section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. § 591 *et seq.* (1988 and Supp. V 1993) ("the Act"), for reimbursement of attorneys' fees he incurred during and as a result of the Iran/Contra investigation conducted by Independent Counsel Lawrence E. Walsh.[1] Regan seeks reimbursement in the amount of $64,202.89 for representation from December 1991 to December 1993. After considering Regan's petition, we find that the request is reasonable in part and that he is entitled to attorneys' fees and expenses in the amount of $41,883.79.

## I. BACKGROUND

Consideration of this petition does not require repetition of the details of the

---

1. Independent Counsel Walsh began his investigation in 1986 and filed a Final Report in 1993. While we continue to entertain fee petitions in this matter, the court will consider untimely any fee petition filed later than six months after the date of this decision.

Iran/Contra investigation, the facts of which are generally collected in cases cited in *In re North (Shultz Fee Application)*, 8 F.3d 847, 849 (D.C.Cir.1993) (per curiam). Regan was White House Chief of Staff for President Ronald Reagan from February 1985 to February 1987. In his investigation as it related to Regan, Independent Counsel ("IC") Walsh focused on actions Regan took in connection with the November 1986 revelation of certain arms transactions underlying the Iran/Contra affair and Regan's later testimony about those matters. In the Final Report, IC Walsh devoted a chapter to Regan, which detailed Regan's contemporaneous notes from the relevant time period, his testimony about his involvement, and the testimony of other figures about Regan's involvement and actions in these matters. Although IC Walsh twice told Regan that he was only considered a witness and not a subject of the investigation, in the Final Report IC Walsh stated that he investigated Regan's conduct to determine whether Regan participated in a conspiracy to cover up President Regan's role in the arms transactions, whether Regan obstructed the Tower Commission,[2] and whether Regan willfully withheld his notes from congressional committees and the IC's office. *Final Report of the Independent Counsel for Iran/Contra Matters*, Aug. 4, 1993, at 522–23. IC Walsh decided, however, not to prosecute Regan because he found no "usable evidence" that Regan orchestrated a cover-up and no "direct evidence" of obstruction of the Tower Board, and because Regan's notes, once produced, were useful. *Id.* IC Walsh concluded that the IC's "investigative purposes would be better served by developing him as a witness rather than a target." *Id.*

As directed by section 593(f) of the Act, we have submitted Regan's fee application to the Attorney General and to IC Walsh for evaluation. The Attorney General and IC Walsh have submitted written evaluations of Regan's fee request which will be considered in our discussion.

2. The Tower Commission was a special review board appointed by President Reagan to study the role and procedures of the National Security Council staff. The Commission's members were

## II. ANALYSIS

■ Regan is entitled to attorneys' fees under the Act if he satisfies section 593(f)(1), which allows the "subject of an investigation conducted by an independent counsel" to request reimbursement for "those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of [the Act] ... if no indictment is brought against such individual pursuant to that investigation...." 28 U.S.C. § 593(f)(1). As this court has previously held, a successful petitioner must thus demonstrate that:

(1) he is a "subject" of such investigation;

(2) the fees were incurred "during" the investigation;

(3) the fees would not have been incurred "but for" the requirements of the Act; and

(4) the fees are "reasonable."

*See In re North (Cave Fee Application)*, 57 F.3d 1117, 1119 (D.C.Cir.1995) (per curiam). We will address each of these requirements in turn.

### A. Regan's "Subject" Status

■ Regan argues that it is clear that IC Walsh focused on him as a subject of the investigation because the Final Report states that it limited its chapters on individuals "to those as to whom there was a possibility of indictment." *Final Report* at xvi. Regan maintains that his subject status began on December 19, 1991, when IC Walsh's deputy obtained a subpoena ordering Regan to testify before the grand jury and to produce certain documents, including Regan's handwritten notes of a November 1986 meeting with President Reagan and others at the White House. Regan admits, however, that when his attorney asked for a clarification of Regan's status, the IC's office informed him that Regan was a witness as far as the grand jury was concerned. In May 1992, Regan testified before the grand jury and shortly thereafter the IC requested additional documents. In August 1992, the IC again sought Regan's testimony before the grand jury and

former Senators John Tower and Edmund Muskie, and former National Security Advisor Brent Scowcroft.

once more reassured Regan that he retained his witness status and was not a subject or target of the investigation.

Regan asserts that while IC Walsh assured him that he was not a subject, in reality Walsh was pursuing his theory that Regan was part of a November 1986 conspiracy to cover up the extent of President Reagan's knowledge of the arms transactions. Relying on *In re North (Dutton Fee Application)*, 11 F.3d 1075, 1078–79 (D.C.Cir.1993) (per curiam), Regan argues that the court has held that the Independent Counsel's assertion that a fee applicant was only a witness is not dispositive as to whether he was a subject for purposes of reimbursement under the Act. Instead, he maintains that to be a subject under the Act, an individual must be one whose conduct was within the scope of the grand jury investigation in a way that would lead a reasonable person to believe that there was a realistic possibility that he would become a defendant. *Id.*

The Attorney General observes that based upon the fee application and the Final Report, it is not clear whether Regan qualifies as a subject under the Act. On the one hand, IC Walsh told Regan during the investigation that he was not a subject, and the Attorney General notes that in a number of cases in which the court has awarded attorneys' fees, we relied on the fact that the applicant was formally notified by the IC that he was a subject. *See, e.g., Cave,* 57 F.3d at 1120; *In re North (Corr Fee Application),* 56 F.3d 261, 263 (D.C.Cir.1995) (per curiam); *In re North (Platt Fee Application),* 31 F.3d 1188, 1189–90 (D.C.Cir.1994) (per curiam). On the other hand, however, the Attorney General also states that the Final Report did devote an entire chapter to Regan, which included an explanation of IC Walsh's decision not to prosecute him, thus suggesting that Regan may well have been a subject of the investigation.

■ IC Walsh agrees that Regan had the status of subject from December 19, 1991, when the IC obtained the grand jury subpoena, until his acquiescence in the production of his notes prior to January 9, 1992. In Walsh's view, however, that status terminated and Regan became at most a witness

when the IC assured him that he was a witness rather than a subject after the turnover of the notes or at the latest in May when, following Regan's testimony before a grand jury, the Independent Counsel renewed that assurance. Walsh's position is not without convincing force. In several cases in which we have held fee applicants to be subjects, we have relied on the formal notice from the independent counsel that such a person was a subject of the investigation. *See, e.g., Cave,* 57 F.3d at 1120; *Corr,* 56 F.3d at 263; *Platt,* 31 F.3d at 1189–90. However, Regan is correct that the converse is not necessarily true. That is, the fact standing alone that the independent counsel determines that an applicant was only a subject and even communicates that determination, while indicative of non-subject status, is not necessarily determinative. That is, an individual qualifies as a subject if his conduct was being examined by the grand jury in a way "that would lead a reasonably counseled person *at the time of incurring the fees* to believe that there was a realistic possibility that he would become a defendant." *Dutton,* 11 F.3d at 1079 (emphasis added). In this case, although we do not doubt the veracity of the Independent Counsel's assertion that he considered Regan a witness, not a subject, it is also true that the investigation was pursuing a conspiracy theory that Regan and his counsel could reasonably believe would have led to his indictment as a co-conspirator in the cover-up of possible statutory violations. Accordingly, Regan had a reasonable basis to believe that there was a realistic possibility that he would become a defendant, and he therefore qualifies as a subject under the Act.

### B. Fees Incurred During the Investigation

■ Regan seeks fees and costs incurred from December 19, 1991, through December 3, 1993. The court has identified the maximum time for which fees can be sought as spanning from when an IC begins an investigation of an individual through to the deadline for filing comments to the final report. *See, e.g., In re Olson,* 884 F.2d 1415, 1421–22 (D.C.Cir.1989) (per curiam). The

relevant time period in this case is from December 19, 1991, when IC Walsh obtained a subpoena directing Regan to testify before the grand jury and produce certain documents, to the December 3, 1993, deadline for filing comments to the Final Report. Since the requested fees fall within this time frame, Regan satisfies this requirement.

### C. The "But For" Requirement

■ Regan argues that the extraordinary nature, scope, and duration of IC Walsh's investigation distinguishes this case from other Justice Department investigations and proves that, because of the Act, high government officials, such as the White House chief of staff, may be subjected to a more·rigorous application of federal investigative and prosecutorial authority than would other citizens. Specifically, Regan points to IC Walsh's investigation of him for a suspected cover-up of President Reagan's knowledge of the Iran/Contra matter, an inquiry which the Justice Department could not and would not conduct because "the competing roles of the attorney general, as a member of the Cabinet and presidential adviser on the one hand and chief law enforcement officer on the other, create an irreconcilable conflict of interest." *Final Report* at 563. Regan also maintains that the fees and costs for submitting comments to the Final Report would likewise not be incurred but for the Act because the final report process is unique to the Act and is not a part of the Department of Justice's prosecutorial process. *See In re Olson,* 884 F.2d at 1421–22; *In re Sealed Motion,* 880 F.2d 1367, 1369 (D.C.Cir.1989) (per curiam).

IC Walsh argues that Regan does not satisfy the "but for" requirement because the extraordinary nature and scope of the investigation was not a burden to the subjects of the investigation but to the Independent Counsel. Suggesting that a different test be applied, IC Walsh states that instead the court should determine whether a Department of Justice that was not tainted by a conflict of interest could have carried out the same investigation without questioning Re-

gan and compelling the production of his notes. Because any prosecutor charged with investigating the Iran/Contra matter would have interviewed Regan, IC Walsh maintains that Regan fails the "but for" requirement. IC Walsh also takes issue with this court's statement in *Shultz,* 8 F.3d at 851, that it was not reasonable to expect that a professional prosecutor would make subjects out of persons previously deemed witnesses four and one half years after the start of the investigation. He states that there was no requirement that he begin all his investigations at once and argues that any other prosecutor would have had to sequence his investigations in a similar manner.

In assessing the "but for" requirement of the Act, we have previously noted that a politically appointed Attorney General would not have subjected attempts to circumvent the Boland Amendments [3] to criminal prosecution and thus "the [Iran/Contra] investigation would never have occurred, nor the fees have been incurred, 'but for' the appointment of the Independent Counsel under the Act." *Dutton,* 11 F.3d at 1080; *see also In re North (Bush Fee Application),* 59 F.3d 184, 188 (D.C.Cir.1995) (per curiam). This means that the investigation of alleged attempts to circumvent the Boland Amendments by various Reagan administration officials would never have occurred "but for" the requirements of the Act and not that an investigation with the same goals would have been carried out differently by a prosecutor who was not an independent counsel. Accordingly, we reject IC Walsh's argument that Regan does not satisfy the "but for" requirements because any prosecutor would have interviewed him in an investigation of an alleged conspiracy to circumvent the Boland Amendments. While the investigation of Regan's actions regarding an alleged cover-up about President Reagan's knowledge of certain Iran/Contra matters certainly falls under the "efforts to circumvent the Boland Amendments" rubric, *Dutton,* 11 F.3d at 1080, it is less clear whether the related investigation of whether Regan improperly withheld documents or obstructed the Tower

---

**3.** The Boland Amendments were riders to the Department of Defense Appropriation Act, Pub.L. No. 97–377, 96 Stat. 1833, 1865 (1982), which prohibited the government from spending money for the purpose of overthrowing the government of Nicaragua.

Commission would not have occurred but for the Act. *Cf. id.* (it is not always clear from "the recitation of the role of a subject in an investigation whether such a subject would have incurred the same fees had the case been handled by the Department of Justice or other executive authorities rather than the Independent Counsel."). A review of the Final Report chapter on Regan suggests, however, that IC Walsh's investigation focused almost exclusively on whether Regan orchestrated a cover-up to hide the extent of President Reagan's knowledge about arms shipments to Iran and that the other allegations were an extremely minor part of the investigation. Based on this, we conclude that Regan has met the burden of showing that his attorneys' fees would not have been incurred but for the Act.

### D. Reasonableness

As we have often observed, the fee petitioner bears the burden of establishing all elements of his entitlement. *See, e.g., Shultz,* 8 F.3d at 852. To demonstrate the reasonableness of his fee petition, Regan submits time records compiled by his attorneys during his representation, a summary of costs, affidavits in support of his attorneys' hourly rates, and a survey of hourly fees for Washington, D.C., law firms. While Regan has for the most part met the burden of demonstrating the reasonableness of his request, several items require adjustment for reasonableness.

■ The first problem with Regan's fee application is that while he requests $62,-746.25 in attorneys' fees (not including costs), the billing statement he submits only documents a total of $53,121.25 in fees. The table below shows the number of hours recorded per billing attorney, and the attorneys' billing rates.

| | | |
|---|---|---|
| John Mintz | 84.5 hours at $260 | $21,970 |
| John Mintz | 74 hours at $270 | $19,980 |
| Theodore Olson | 25 hours at $385 | $9,625 |
| Theodore Olson | 1.5 hours at $400 | $600 |
| Theodore Boutrous | 1 hour at $235 | $235 |
| Theodore Boutrous | 1 hour at $250 | $250 |
| Michelle Bodley | 2.25 hours at $205 | $461.25 |
| | total hours 189.25 | total fees $53,121.25 |

Thus, there will first be a deduction of $9,625 for attorneys' fees that were claimed but were not documented in any way.

■ Second, several entries are for time spent reviewing an unfavorable magazine article about Regan and considering a possible response to it. Although Regan explains that he believed that some of the information in the article may have been leaked by the IC's office, we have previously determined that "[m]edia related activity has no bearing on the operation of an independent counsel's investigation and thus is not reasonably related to a defense to such investigation." *In re Donovan,* 877 F.2d 982, 994 (D.C.Cir.1989) (per curiam); *see also In re North (Gardner Fee Application),* 30 F.3d 143, 147 (D.C.Cir. 1994) (per curiam). While reviewing the article and preparing a response to it are a rational defense of Regan's reputation, they are not reasonably related to his defense from IC Walsh's investigation and we therefore deny reimbursement for the 5.5 hours of Mintz's time billed at $270 per hour expended on these media-related activities.

■ Third, Regan seeks reimbursement for 71 hours of attorneys' fees in connection with the Final Report out of a total of 189.25 hours of attorney time, so that the fees connected with the Final Report make up more than one third of the total fees requested. This court has previously held that while fees for reading and responding to the Final Report are reimbursable, they must not be a disproportionately large share of the overall fee award. *See Gardner,* 30 F.3d at 147 (holding that one quarter of total fees requested for responding to final report was a disproportionately large share); *Bush,* 59 F.3d at 194–95 (disproportionate final report fees reduced by approximately one half). Based on this precedent, we will award one half of the amount requested by Regan for fees arising from the Final Report. Accordingly, we will subtract .75 hours billed by Olson at $400, 34.25 hours billed by Mintz at $270, and .5 hours billed by Boutrous at $250.

■ Additionally, Regan's attorneys billed for time they spent traveling to and

from Regan's office, which differs from the usual practice of professionals of receiving clients in their offices. Regan makes no explanation for this practice, and it requires an adjustment in billing on the basis of reasonableness. Certain fees that may not be "unreasonable between a first class law firm and a solvent client, are not [always] supported by indicia of reasonableness sufficient to allow us justly to tax the same against the United States." *Shultz,* 8 F.3d at 852; *see also Bush,* 59 F.3d at 189. While it is difficult to calculate the exact amount of time in transit due to the fact that it is not set out separately in the billing statement, we will estimate that it was a twenty-minute trip each way, and we will deduct the time billed for this type of travel. Mintz billed 4 2/3 hours for travel at a rate of $260 per hour,

and we will therefore subtract $1,211.60 from the request.

■ IC Walsh objects to the reimbursement of attorneys' fees for time spent collaborating with counsel for Secretary Shultz and Secretary Weinberger on the basis that the efforts to assist those being prosecuted by him should not be reimbursed by the government. The billing entries, however, do not indicate that Regan's attorneys were conferring with other counsel merely to aid the other subjects but rather to share information about the investigation and IC Walsh's strategy in general, which might aid the defense of Regan as well as the other subjects. Accordingly, these fees are reasonable and are properly reimbursable under the Act.

In sum, Regan's requested attorneys' fees will be reduced as follows:

| | |
|---|---|
| Original attorneys' fees requested | $62,746.25 |
| Deduction for undocumented billing | ($9,625) |
| Deduction for media-related activity | ($1,485) |
| Deduction for Final Report billing | ($9,672.50) |
| Deduction for travel to Regan's office | ($1,211.60) |
| Final attorneys' fees awarded | $40,752.15 |

As for expenses, the $325 expense claimed by Regan for use of limousine as transportation to a grand jury appearance is not supported by "indicia of reasonableness sufficient to allow us justly to tax the same against the United States." *Shultz,* 8 F.3d at 852. Accordingly, we will subtract this amount from Regan's $1,456.64 expense request and award $1,131.64 in expenses.

### III. CONCLUSION

Based on the foregoing analysis, we will grant Regan's petition in part and award $40,752.15 for attorneys' fees and $1,131.64 for expenses, making a total award of $41,-883.79.

*Judgment accordingly.*